UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DARLENE HAROLD AND LUTHER
HAROLD, parents and next friend and
DEANA HAROLD,
Plaintiffs-Appellants,

v.                                                                        No. 97-1077

ROBERT CENDO, M.D.; MEMORIAL
HOSPITAL AND MEDICAL CENTER OF
CUMBERLAND, INCORPORATED,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-96-440-AMD)

Argued: October 29, 1997

Decided: November 26, 1997

Before WILKINS and MOTZ, Circuit Judges, and CAMPBELL,
Senior Circuit Judge of the United States Court of Appeals
for the First Circuit, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward Greensfelder, Jr., Washington, D.C., for Appel-
lants. Frederick William Goundry, III, VARNER & KASLICK, P.C.,

Frederick, Maryland; Jeffrey Schuyler Getty, GEPPERT, MCMUL-LEN, PAYE & GETTY, Cumberland, Maryland, for Appellees. **ON BRIEF:** Conrad W. Varner, VARNER & KASLICK, P.C., Frederick, Maryland, for Appellee Cendo; Robert S. Paye, GEPPERT, MCMULLEN, PAYE & GETTY, Cumberland, Maryland, for Appel-lee Hospital.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On Friday, August 9, 1991, the car in which Deana Harold traveled ran off the road in a remote area of West Virginia and collided with a tree. Severely injured, Deana and the driver were removed from the wreckage and rushed to Grant Memorial Hospital in Grant County, West Virginia.

Because Deana's injuries required attention from an orthopedic surgeon and neurosurgeon, she was transferred to Memorial Hospital and Medical Center of Cumberland, Incorporated (Memorial Hospital or the Hospital), in Cumberland, Maryland. The Hospital is desig-nated an area-wide trauma center by the Maryland Institute for Emer-gency Medical Services Systems (MIEMSS), an organization established by the Maryland General Assembly to coordinate a state-wide system of emergency services. At Memorial Hospital, a team of the Hospital's trauma surgeons treated Deana, namely, Dr. Beck (emergency medicine), Dr. Miltenberger (general surgery), Dr. Robert Cendo, (orthopedic surgery), Dr. Figueroa (neurosurgery), and Dr. Sagin (pulmonary medicine). The Hospital directly employed the emergency room physician; the others were private, on-call physi-cians. Dr. Cendo became Deana's physician -- in charge of admitting Deana and treating her orthopedic injuries.

2

An examination performed in the Hospital's emergency room revealed that Deana was hypoxic, comatose, and suffering from numerous fractures to her tibia, fibula and femur in her left leg. According to Dr. Cendo, he then consulted with Dr. Figueroa, who advised him that Deana's head injury made her too unstable to undergo surgery. Rather than surgically repairing Deana's leg, Dr. Cendo opted to perform a closed reduction procedure on Deana's leg, which required the placement of skeletal pins and traction. Dr. Figueroa believed Deana's head injuries warranted a CT Scan, but because the Hospital's CT Scan machine was broken, Deana's CT Scan had to wait until Monday, August 12.

During the evening of Sunday, August 11, Deana developed complications, and by early Monday morning she was suffering respiratory distress. Hospital personnel intubated Deana and placed her on a mechanical ventilator. A carotid angiogram and CT Scan were then performed. Deana remained comatose at Memorial Hospital for the following six to eight weeks. The medical treatment that she received allegedly caused her serious permanent injuries, pain, and emotional suffering that she would not otherwise have suffered, and medical expenses and the loss of earnings that she would not otherwise have incurred.

On March 9, 1993, her parents, Darlene and Luther Harold, on behalf of Deana, who had not yet reached majority, settled Deana's claims against the driver of the car, the owner of the car, and the owner's insurance company. The Harolds also signed a written release discharging the driver and "all other persons, firms and corporations" from liability arising out of the accident. In May 1994, the Harolds filed a "Statement of Claim," which they amended in July 1994, against Dr. Cendo and Memorial Hospital in the Health Claims Arbitration Office of Maryland (HCAO). They asserted that Cendo and Memorial Hospital had committed medical malpractice in their care of Deana. The parties agreed to waive arbitration pursuant to the Health Care Malpractice Claims Arbitration Act, (the Arbitration Act). See Md. Code Ann., Cts. & Jud. Proc.§ 3-2A-06A (1995 and Supp. 1996). Thereafter, as permitted by § 3-2A-06A(c) of the Arbitration Act, the Harolds brought this diversity action against Dr. Cendo and Memorial Hospital in the United States District Court for the District of Maryland.

3

On January 8, 1997, scheduled as the first day of a three-week trial, the district court granted summary judgment to the defendants, reasoning that in releasing the driver and owner of the car, the Harolds had also released Dr. Cendo and the Hospital. Alternatively, the district court granted the Hospital judgment as to some allegations in the complaint, holding that those allegations involved issues for which the Harolds had filed no arbitration claim. The court also denied the Harolds' motion to amend the complaint to add a cause of action for lack of informed consent. Finally, the court resolved two evidentiary questions against the Harolds.

The Harolds appeal all of the above rulings. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

We review a grant of summary judgment de novo . Summary judgment is appropriate when no genuine issues of material fact exist, and a party is entitled to judgment as a matter of law. See Bowling v. Wellmore Coal Corp., 114 F.3d 458 (4th Cir. 1997).

The district court held that the liability release between the Harolds and the driver of the other car had the effect of releasing Dr. Cendo and the Hospital. The release states in pertinent part that, in consideration of the payment of $25,000, the Harolds released the driver and the owner of the car, and

> any and all other persons, firms and corporations, whether herein named or referred to or not, of and from any and all past, present and future actions, causes of action, claims, demands, damages, costs, loss of services, expenses, compensation, third party actions, suits at law or in equity, including claims or suits for contribution and/or indemnity, of whatever nature, and all consequential damage on account of, or in any way growing out of any and all known and unknown personal injuries, death and/or property damage resulting or to result from an accident that occurred on or about the 9th day of Aug. 1991, at or near Franklin, W. Va.

4

At the time they executed the release the Harolds and the driver and owner of the car resided in Virginia and entered into the release in that state. Accordingly, the parties agree that Virginia law controls interpretation of the release. See Continental Cablevision of New England, Inc. v. United Broadcasting Co., 873 F.2d 717, 720-21 (4th Cir. 1989) (federal court sitting in diversity applies choice of law rules of forum state; for contracts, Maryland follows the lex loci contractus rule).

In finding the release reached Dr. Cendo and the Hospital, the district court relied on State Farm Mut. Ins. Co. v. Reynolds, 676 F. Supp. 106 (W.D. Va. 1987) (applying Virginia law). The Reynolds court held that a broad release, like that at issue here, released all non-named tortfeasors, despite the existence of a Virginia statute that provided a release by one joint tortfeasor does not necessarily discharge the remaining ones. See id. at 107. The Reynolds court emphasized that it decided the case based on the literal language of the release because "neither side ha[d] presented, nor suggested, the existence of any evidence pertaining to the intent of the parties." Id.

Lemke v. Sears, Roebuck & Co., 853 F.2d 253 (4th Cir. 1988) (applying Virginia law), a case decided after Reynolds, severely undermines the applicability of the Reynolds rationale to the case at hand. In Lemke, which the parties never cited to the district court, we held that a release almost identical to the one at issue here did not, as a matter of law, release other potential joint tortfeasors. The Virginia legislature only in modern times abrogated the well-established common law rule that releasing one tortfeasor acts as a release of all, and so we reasoned that the intent of the parties was critical to determining whether the plaintiff had also released the defendants from liability. See id. at 255. Thus, we found that whether parties to a release intended for it to apply to unnamed tortfeasors ("strangers" to the release) presented a question of fact reserved for the fact finder, and not appropriate for resolution on summary judgment. See id.

In accordance with Lemke, we can only conclude that the district court erred in holding that, as a matter of law, the Harolds' release of the car driver and owner also released Dr. Cendo and the Hospital. This is especially so because, unlike Reynolds, the Harolds have

5

pointed to extensive testimony regarding their intent not to release Dr. Cendo or the Hospital when releasing the driver.

Dr. Cendo and the Hospital argue that even under Lemke they are entitled to summary judgment because they were intended third-party beneficiaries of the release. They rely on the suggestion in Lemke that if parties not named in a release are third-party beneficiaries of it, and thus not "strangers" to it, they are entitled to enforce the benefits of the release without exploring the parties' intent. See id. n.4. To qualify as a third-party beneficiary, however, a party must show that "the contracting parties clearly intended to directly benefit him." Id. (quoting Radosevic v. Virginia Intermont College, 651 F. Supp. 1037, 1038 (W.D. Va. 1987)) (internal quotation marks omitted). The facts as to the defendants' status as third-party beneficiaries, vel non, like the facts as to whether the Harolds intended to release them, are heavily disputed. On one hand, the defendants assert that their reduction of Deana's medical bills to effectuate the settlement between Deana and the other driver demonstrates their third-party status. On the other, the Harolds offer testimony that they never intended to release the defendants from liability and point to the fact that the settlement amount -- $25,000 -- was totally inadequate to redress Deana's extensive injuries. Thus, a genuine issue of material fact exists as to the third-party beneficiary status of Dr. Cendo and the Hospital.

Accordingly, because material issues of fact remain as to the intent of the parties to the release and the status of Dr. Cendo and the Hospital as third-party beneficiaries, the district court erred in ruling, as a matter of law, that the release between the Harolds and the driver of the car necessarily also released Dr. Cendo and the Hospital.

II.

The district court granted Memorial Hospital judgment on the pleadings with respect to certain malpractice allegations in the Harolds' complaint on the theory that the Harolds had not filed a claim with the HCAO as to those allegations. We review the district court's grant of judgment on the pleadings de novo. See Gutierrez v. Peters, 111 F.3d 1364, 1368 (7th Cir. 1997).

The Arbitration Act requires that a medical malpractice claim be submitted to arbitration as a condition precedent to the filing of a judi-

6

cial action for malpractice. See Oxtoby v. McGowan, 447 A.2d 860, 865 (Md. 1982). Thus, although the parties may ultimately agree to waive arbitration, as they did here, a plaintiff must initially file a malpractice claim with the HCAO in order to file a later civil action seeking recovery for that malpractice. This much is clear. What is unclear is whether the Harolds, in their complaint, attempted to pursue malpractice claims for which they never filed a claim with the HCAO, and if so, what those additional claims were.

In May 1994, the Harolds filed an initial "Statement of Claim" against Dr. Cendo and Memorial Hospital with the HCAO. In July 1994, they filed an "Amended Statement of Claim." The amended statement asserts, inter alia, that:

> Cendo deviated from the standards of orthopaedic and medical care by, inter alia, failing to perform prompt[,] aggressive and early operative internal fixation of Claimant's left femoral, tibial and fibular fractures or failing to advise her of alternative methods of treatment and the risks associated with not transferring her or reducing her fractures . . . [and Memorial Hospital] deviated from standards of medical care in, inter alia, failing to obtain for Claimant early internal fixation of Claimant's fractures; or, absent the wherewithal to do so, to immediately transfer Claimant to a higher level medical center . . . or failing to advise her of alternative methods of treatment and the risks associated with not transferring her or reducing her fractures.

A "Certificate of a Qualified Expert," executed by orthopedic surgeon Randy Davis, accompanied the original Statement of Claim. Dr. Davis certified that the acts alleged in the statement "constituted departure from the standards of care ordinarily exercised by similar orthopaedic surgeons and hospitals in the treatment of their patients under similar circumstances." Subsequently, the parties agreed to waive arbitration of the "claims now pending."

Thereafter, the Harolds brought this action. In the second count of their two count complaint, they alleged:

> Pursuant to the Defendant Hospital's designation by MIEMSS as an Areawide Trauma Center, the Defendant

7

Hospital directed and authorized Defendant Cendo and Drs. Miltenberger, Figueroa and Sagin actual authority to provide [all required medical care for Deana]. In their care and treatment of Plaintiff's leg and head injuries, Defendant Cendo and Drs. Miltenberger, Figueroa and Sagin were acting as agents of and on behalf of Defendant Hospital.

By accepting the designation by MIEMSS as an Areawide Trauma Center and by its establishment of its Trauma Center Protocols and its Trauma Team . . . the Defendant Hospital held out its aforesaid Trauma Team as agents with apparent authority to provide all of the medical care and treatment required by Plaintiff.

. . . Plaintiff's mother and father relied upon the Defendant Hospital's being a trauma center that was qualified to provide . . . medical care and services required by Plaintiff . . . .

. . . Defendant Hospital's Trauma Team failed to abide by its written Trauma Center Protocols governing the care and treatment of trauma patients having a suspected head injury that it had represented to MIEMSS and surrounding medical care providers that it would provide.

The Defendant Hospital deviated from standards of medical care in failing to provide Plaintiff with the medical treatment and care reasonably required by a trauma patient at a MIEMSS designated Areawide Trauma Center, including (1) the failure to comply with the MIEMSS "Fly-By-Policy," adopted by the Defendant Hospital, to notify Civil Defense and SYSCOM immediately upon the breakdown of its CT Scan machine that it was operating at a limited capacity due to the need to repair the CT Scan machine; (2) the failure, irrespective of its failure to comply with the aforesaid MIEMSS "Fly-By-Policy," to have promptly informed its Emergency Department, its Trauma Team and Dr. Beck of the breakdown of its CT Scan machine, or, alternatively, having so notified its Emergency Department, its Trauma Team and/or Dr. Beck, their having accepted Plaintiff as a

8

trauma patient knowing that Defendant Hospital's CT Scan machine was broken and in need of repair; (3) Dr. Figueroa having recommended to Defendant Cendo that he wait to perform internal fixation of Plaintiff's fractures because of Plaintiff's head injuries, the failure of Defendant Hospital's Trauma Team to obtain an anesthesiology consultation to determine the feasibility of performing the fixation of Plaintiff's leg fractures under general anesthesia; . . . .

The Hospital moved "for Judgment on Pleadings or, alternatively, Partial Summary Judgment" as to this count, asserting:

> Count II of the Complaint fails to state a claim upon which relief may be granted against Hospital with respect to liability for the alleged acts of the neurosurgeon, Dr. Figueroa, and for liability for the alleged acts of a collective trauma team, and any such claims should be dismissed . . . .

The district court orally granted the Hospital's motion "with respect to any claim other than the claims specifically alleged and set out as a part of the health claims arbitration proceedings." Specifically, the court ruled that the Harolds could not pursue any claim "on the basis of so-called team negligence or trauma-team deviation from the standard of care" or any "claim arising against the hospital in any way based on the neurological decisions and recommendations that were made by Dr. Fugueroa." A few days later, the court entered a written order stating simply that the motion of the Hospital "for judgment on the pleadings is granted."

The Harolds read this order as dismissing Count II in its entirety as to the Hospital and, thus, since that is the only count containing claims against the Hospital, eliminating the Hospital as defendant in the case. The Hospital, however, straightforwardly recognizes that Maryland decisions have permitted recovery based on apparent authority in certain limited instances. See Mehlman v. Powell, 378 A.2d 1121 (Md. 1977). The Hospital maintains that "[t]he District Court's ruling leaves intact [the Harolds'] claim against the hospital for the acts of the orthopedist/attending physician as apparent agent," but insists that the district court's order precludes claims against the

9

Hospital "based upon the neurosurgical decisions and claims based upon alleged team negligence."

The unity of the Harolds' claims, however, poses difficulty for the Hospital's argument. The Harolds seek through their federal complaint, as they did in their arbitration statement, to assert that physicians (Drs. Miltenberger, Figueroa, Sagin, and Cendo) and other staff at the Hospital, acting with the apparent authority of the Hospital, committed malpractice in failing to properly fixate Deana's leg fractures and, in view of the breakdown of its CT Scan machine, in accepting Deana as a trauma patient. These allegations state a cause of action against the Hospital under Maryland law. See Mehlman, 378 A.2d at 1124 (holding that when a hospital vests its staff with apparent authority and causes a plaintiff "to rely on the[ir] skill," the hospital "is consequently liable to the [plaintiff] as if the . . . staff were its employees.")

To be sure, the Harolds' federal complaint is more detailed than its arbitration Statement of Claim. Indeed, the complaint could be read to assert "team negligence" or even a malpractice claim against Dr. Figueroa. But the Harolds specifically disavow such claims. They can and should be held to such disavowals. However, their basic claim against the Hospital in the complaint parallels the claim set forth, albeit with less particularity, in their Statement of Claim filed with the HCAO -- i.e., the Hospital, through its agents, committed malpractice in negligently failing to treat Deana's injuries and in accepting her as a trauma patient when its CT Scan machine was broken. The Harolds are entitled to pursue that claim in this action, and to attempt to prove it by use of state protocols for trauma centers and testimony as to the activities of Drs. Miltenberger, Figueroa, and Sagin, as well as Dr. Cendo. The district court's contrary ruling must be reversed.

III.

On December 16, 1996 -- ten months after filing their complaint initiating this action and three weeks prior to the scheduled trial -- the Harolds moved to amend their complaint to assert a separate cause of action for malpractice resulting from failure to obtain Deana's informed consent. The district court denied the motion, finding "palpable prejudice" would result to the defendants if it permitted the

10

amendment because "nothing in the record . . . support[s] the conclusion that [defendants were] put on adequate notice" of this claim.

We review the district court's denial of the Harolds' motion to amend its complaint under an abuse of discretion standard, see Davis v. Piper Aircraft Corp., 615 F.2d 606, 612-13 (4th Cir. 1980), but in light of the strong policy favoring amendment. See Allwaste, Inc. v. Hecht, 65 F.3d 1523, 1530 (9th Cir. 1995). An appellate court "will find abuse based on a showing that the district court made an error in judgment or clearly erroneous findings." 3 Moore's Federal Practice, § 15.14[2] (Matthew Bender 3d ed.) [hereinafter Moore's].

Rule 15(a) of the Federal Rules of Civil Procedure permits amendment of a complaint over the adverse party's objection after a responsive pleading has been filed only by leave of court, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In Foman v. Davis, 371 U.S. 178, 182 (1962), the Supreme Court "clarified the factors that a district judge may use to deny leave to amend." Moore's, § 15.15[1]. These are "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment." Id.

The district court relied on only one of these grounds -- prejudice to the defendants. In concluding that the defendants would be prejudiced by the proposed amendment, we believe the district court abused its discretion. The court based its ruling on a clearly erroneous factual finding, namely, nothing in the record supported the conclusion that, prior to the motion to amend, the defendants had been put on notice of the informed consent claim. In fact, in the Harolds' Amended Statement of Claim filed with the HCAO on July 5, 1994 -- a year and a half before this suit was filed-- the Harolds put the defendants on express notice of an informed consent claim, alleging in a separate count titled "Lack of Informed Consent" that the defendants "failed to obtain Claimants' informed consent not to transfer Claimant timely to another hospital for CAT scan and appropriate early operative internal fixation." In addition, defense counsel posed numerous questions to the Harolds at deposition regarding the conversations they had with the physicians caring for Deana, ostensibly to determine whether the defendants had failed to obtain the Harolds'

11

informed consent. We note that our sister circuits have similarly concluded that when there has been no undue delay, bad faith, or dilatoriness, a district court's denial of a motion to amend based on a finding of prejudice that is not supported by the record constitutes an abuse of discretion. See, e.g., Security Ins. Co. of Hartford v. Tucker & Assocs., Inc., 64 F.3d 1001, 1009 (6th Cir. 1995); United States v. Continental Ill. Nat'l. Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989); Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 694-95 (8th Cir. 1981).

IV.

The Harolds also challenge two evidentiary rulings of the district court. Our review convinces us that the district court acted well within its discretion in both matters.

First, the district court denied the Harolds' motion in limine to exclude Dr. Figueroa's testimony as to his custom of advising orthopedic surgeons not to operate on orthopedic injuries when the patient has a head injury. In deposition, Dr. Figueroa testified that he could not remember so advising Dr. Cendo with regard to Deana, but that this was his invariable practice. Dr. Cendo confirmed that when treating Deana he had been given this advice by Dr. Figueroa. The district court did not abuse its discretion in holding that this evidence constituted a proper basis to permit testimony as to Dr. Figueroa's habit. See Fed. R. Evid. 406.

The Harolds' challenge to the district court's other pre-trial evidentiary ruling also lacks merit. The district court granted the defendants' motion in limine to exclude the expert testimony of a neurosurgeon, Dr. Aldrich. Although the Harolds designated a number of experts pursuant to Federal Rule of Civil Procedure 26(a), they failed to designate any neurosurgical expert. In the Pretrial Order, filed two months prior to trial, the Harolds listed Dr. Aldrich as a witness, but did not designate him as an expert. The district court concluded that permitting Dr. Aldrich to testify at trial, when he had never been deposed and was only disclosed as an expert on the eve of trial, had the "clear potential for great prejudice to the defendants." The court did not abuse its discretion in so ruling.

12

V.

To summarize, we reverse (1) the grant of summary judgment to Dr. Cendo and the Hospital on the basis of the release between the Harolds and the driver of the car, (2) the grant of judgment on the pleadings to the Hospital, and (3) the refusal to permit the Harolds to amend their complaint to include a separate count as to informed consent; however, we affirm the district court's evidentiary rulings permitting Dr. Figueroa's habit testimony and excluding Dr. Aldrich's expert testimony. We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS

13